IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JOSHUA E.E. SHOWALTER,**

      **Plaintiff,**

  vs.                                Civil Action 2:13-cv-283
                                         Judge Economus
                                         Magistrate Judge King

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

**REPORT AND RECOMMENDATION**

**I.   Background**

This is an action instituted under the provisions of 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security denying plaintiff's applications for a period of disability, disability insurance benefits, and supplemental security income. This matter is now before the Court on *Plaintiff Joshua Showalter's Statement of Specific Errors* ("*Statement of Errors*"), Doc. No. 12, the *Defendant's Memorandum in Opposition* ("*Commissioner's Response*"), Doc. No. 18, and *Plaintiff's Reply*, Doc. No. 19.

Plaintiff Joshua E.E. Showalter was awarded child's disability benefits in 1996 but, upon reaching the age of 18, was found not to meet the disability standards for adults. *PAGEID* 153-160. He filed his current applications for benefits on March 10, 2010, alleging that he has been disabled since June 1, 2007. *PAGEID* 65, 264, 271. The applications were denied initially and upon reconsideration, and plaintiff requested a *de novo* hearing before an administrative law

judge.

An administrative hearing was held on July 28, 2011, at which plaintiff appeared *pro se*, and his mother, Darlene Showalter, appeared as a witness. *PAGEID* 125-35. During the hearing, which was described as a "preliminary hearing," the administrative law judge informed plaintiff of his right to an attorney, recommended that plaintiff retain an attorney and continued the hearing to October 18, 2011. *Id*. The administrative law judge also briefly discussed plaintiff's medical records and treatment history, advised plaintiff that he would be required to produce medical records in support of his claim, and "point[ed] out [a] problem to [plaintiff:] . . . You have no medical evidence in support of your claim . . . ." *PAGEID* 133-35.

A second administrative hearing was held on October 18, 2011, at which plaintiff, now represented by counsel, appeared and testified, as did plaintiff's sister, Brandi Sue Coulter, who testified as a witness, and Steven Rosenthal, who testified as a vocational expert. *PAGEID* 84, 105. In a decision dated November 2, 2011, the administrative law judge concluded that plaintiff was not disabled from June 1, 2007, through the date of the administrative decision. *PAGEID* 75-76. That decision became the final decision of the Commissioner of Social Security when the Appeals Council declined review on February 7, 2013. *PAGEID* 45.

Plaintiff was 30 years of age on the date of the administrative decision. *See PAGEID* 76, 264. Plaintiff has a limited education, is able to communicate in English, and has past relevant work as a

2

janitor, material handler, farm laborer, nursery laborer, and building cleaner. *PAGEID* 75, 412, 414. Plaintiff was insured for disability insurance purposes through December 31, 2010. *PAGEID* 67. He has not engaged in substantial gainful activity since June 1, 2007, his alleged disability onset date. *Id*.

**II. Medical Evidence**

Plaintiff's school records indicate that he was assigned to developmentally handicapped classes in third grade. *PAGEID* 288. Plaintiff participated in the regular educational environment only for lunch, study hall, and assemblies. *PAGEID* 298. In January and February 1997, when plaintiff was 15 years of age and in the ninth grade, he underwent a multi factored evaluation ("MFE") to measure his academic and adaptive progress and continued eligibility for placement in special education classes. *PAGEID* 299-314. On the WRAT3, plaintiff tested at the first grade in reading and spelling and at the second grade in arithmetic. *PAGEID* 302. These results were interpreted as follows:

> Joshua's academic skills on the WRAT fell at the lower extreme for chronological age. His reading (word recognition) and spelling, which appeared somewhat restricted for intellectual level, were equivalent to only first grade. Joshua could identify and write from dictation alphabet letters. He had a small fund of sight reading words and well memorized spelling words. Arithmetic achievement was equivalent to second grade. Joshua could add and subtract with regrouping, but made some computation errors. He did not attempt multiplication or division facts.

*PAGEID* 303. On the Stanford-Binet (4th Ed.), plaintiff achieved

3

a verbal reasoning standard age score ("SAS") of 68, an abstract/visual reasoning SAS of 85, a quantitative reasoning SAS of 66, a short-term memory SAS of 68, and a test composite score of 68. *PAGEID* 304-05.  These results were interpreted as follows:

> Joshua's intellectual ability, as measured by the Stanford-Binet: FE, fell significantly below average.  His ability, which meets or exceeds that of only 2% of the population, is classified as being Mildly Deficient.  There is a 90% chance that Joshua's true Standford-Binet: FE SAS is contained within the range of scores from 64 to 72.  This is highly consistent with results of previous evaluations, with a WISC-R IQ of 71 being obtained in September, 1991, and a WISC-III IQ of 67 being obtained in November, 1993.  On the Stanford-Binet a relative strength for Joshua involved his ability to reason with visual-spatial nonlanguage tasks.  On the basis of Joshua's measured intellectual ability we would presently expect him to be achieving academically on approximately a fourth to fifth grade level.
>
> Joshua's reproduction of the Bender-Gestalt designs, a supplemental test of visual motor perception, was normal for chronological age, according to the Watkin's Scoring System.  This is consistent with the youth's relative strength with visual-spatial tasks on the cognitive instrument.
>
> Joshua is a normal appearing 15 year old youth who is not accomplished regarding the finer points of grooming.  He was polite and highly cooperative.  Joshua appeared to try hard to achieve success and was persistent in his efforts.  He employed a reflective approach with visual-spatial tasks and overtly did not appear frustrated when he encountered difficulties.  His relative visual-spatial strength in conjunction with his reflective approach with the materials suggests that Joshua has the potential to be a good worker with manual tasks.

*Id*.

An Adaptive Behavior Inventory ("ABI") was also administered in January 1997 based on observations of plaintiff in the educational setting by his special education teacher and as interpreted by the

school's psychologist. *PAGEID* 308. Plaintiff achieved an ABI full scale quotient of 48, which placed his "general adaptive functioning at the lower extreme for chronological age." *Id*. Plaintiff's performance in self-care skills, communication skills, social skills, academic skills, occupational skills, and his overall ABI composite quotient each fell at or below the first percentile of achievement. *Id*.

In an employability/life skills assessment, plaintiff's special education teacher reported that plaintiff "needs to improve employability skills in the areas of punctuality and attending on time, general work habits, work quantity and quality, relations with supervisors, setting personal goals and showing initiative." *PAGEID* 309.

Based on his MFE, plaintiff was assigned to "special education services in the developmentally handicapped program," using a modified curriculum with small group instruction. *PAGEID* 313-14.

James C. Tanley, Ph.D., consultatively psychologically evaluated plaintiff on May 20, 2005. On the WAIS-III, plaintiff achieved a verbal IQ score of 66, a performance IQ score of 78, and a full scale IQ score of 69. *PAGEID* 481. Dr. Tanley opined that the "12 point VIQ-PIQ spread is significant and suggestive of a Learning Disorder for verbally mediated material. He will therefore be diagnosed with said Learning Disorder and Borderline intelligence per his PIQ." *Id*. Dr. Tanley assigned a global assessment of functioning score ("GAF")

5

of 60[1] and diagnosed a learning disorder NOS and borderline intelligence (PIQ). *PAGEID* 482.

John S. Reece, Psy.D., consultatively evaluated plaintiff on March 20, 2008, *PAGEID* 483-86, assigned a GAF score of 60 and diagnosed borderline intellectual functioning. *PAGEID* 485. Dr. Reece did not have access to plaintiff's achievement testing results. *PAGEID* 486. According to Dr. Reece, plaintiff had mild limitations in his ability to (i) relate to others, including fellow workers and supervisors, (ii) withstand the stress and pressures associated with daily work activity, and (iii) manage funds. *Id*. Plaintiff had moderate limitations in his ability to understand, remember, and follow instructions and to maintain attention, concentration, persistence, and pace sufficient to perform simple, repetitive tasks. *Id*.

Joan Williams, Ph.D., reviewed the record for the state agency on April 18, 2008, and completed a mental residual functional capacity assessment and psychiatric review technique form. *PAGEID* 488-505. Dr. Williams opined that plaintiff was moderately limited in his ability to (i) understand and remember detailed instructions, (ii) carry out detailed instructions, and (iii) maintain attention and

---

[1]
    The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning . . . .

*Norris v. Comm'r of Soc. Sec.*, No. 11-5424, 2012 WL 372986 (6th Cir. Feb. 7, 2012).

6

concentration for extended periods. *PAGEID* 488. Plaintiff had mild difficulty in maintaining social functioning, moderate restrictions of activities of daily living, and moderate difficulty in maintaining concentration, persistence, or pace. *PAGEID* 502. According to Dr. Williams, plaintiff has the residual functional capacity to perform simple, routine, repetitive work that involves no reading. *PAGEID* 490.

Sylvester Briggs, Ph.D., consultatively evaluated plaintiff on December 31, 2008. *PAGEID* 506-15. Plaintiff reported problems with social relationships; difficulty concentrating, focusing, and remembering critical matters; problems with comprehending and following verbal commands and directives; and "concerns about his noticeably flawed cognitive capacity." *PAGEID* 514-15. Plaintiff appeared to be moderately depressed and emotionally labile during the evaluation. *Id*. Dr. Briggs assigned a GAF score of 55 and diagnosed a mood disorder and an anxiety disorder due to a cognitive disorder; occupational problems; "Borderline Intellectual Functioning (most likely mild MR)"; and cluster C personality disorder, avoidant/dependent personality disorder. *PAGEID* 514. According to Dr. Briggs, plaintiff was markedly impaired in his mental and psychological ability to manage funds and in his mental ability to (i) relate to others, including co-workers and supervisors, (ii) understand, remember, and follow instructions, and (iii) maintain attention, concentration, persistence, and pace to perform repetitive, routine, simple tasks. *PAGEID* 514-15. Plaintiff was moderately

7

impaired in his ability to withstand the stress and pressures associated with day-to-day work activities. *Id*.

John Waddell, Ph.D., reviewed the record for the state agency on February 5, 2009, and completed a mental residual functional capacity assessment and psychiatric review technique form. *PAGEID* 516-33. According to Dr. Waddell, plaintiff was markedly impaired in his ability to understand, remember and carry out detailed instructions. *PAGEID* 530-31. Plaintiff was moderately impaired in six areas of functioning relating to sustained concentration and persistence, social interaction, and adaptation. *Id*. Dr. Waddell further opined that plaintiff had mild restrictions of activities of daily living, moderate difficulty in maintaining social functioning and in maintaining concentration, persistence, or pace. *PAGEID* 526. Dr. Waddell concluded that plaintiff is "quite cognitively limited, . . . cannot read or write, and can only do very simple math." *PAGEID* 533. Plaintiff is "moderately limited in all areas. However, he retains the capacity to complete simple tasks that do not require a rapid or consistent pace. [Plaintiff] can engage appropriately in simple social interactions." *Id*.

Irma Johnston, Psy.D., also reviewed the record and, on June 2, 2009, affirmed Dr. Waddell's assessment. *PAGEID* 534.

Stephen R. Yerian, Psy.D., consultatively evaluated plaintiff on April 26, 2010. *PAGEID* 568-75. Plaintiff reported that he suffers from depression, paranoia, sleep disturbance, back pain, and migraines. *PAGEID* 569. Plaintiff also reported "feeling irritability

8

and easily aggravated and frustrated; being isolated and withdrawn from others; excessive sleeping; feeling tired most days; experiencing diminished energy; diminished interest and motivation; and poor concentration." *PAGEID* 573.  Dr. Yerian assigned a GAF of 55 and diagnosed a major depressive disorder, single episode, moderate, and borderline intellectual functioning.  *Id*.  Dr. Yerian further opined that plaintiff was markedly impaired in his ability to withstand the stress and pressures associated with day-to-day work; moderately impaired in his ability to relate to others, comprehend and respond to verbal questions and inquiries, remember, maintain pace from a mental health perspective, and persist on tasks from a mental health perspective; and mildly impaired in his ability to understand and follow instructions that are simple, concrete, and not detailed.  *PAGEID* 573-75.  Finally, Dr. Yerian opined that plaintiff does not have the mental ability to manage his own funds.  *PAGEID* 574.

     Jennifer Swain, Psy.D., reviewed the record for the state agency on May 22, 2010 and completed a mental residual functional capacity assessment and psychiatric review technique form.  *PAGEID* 576-93.  According to Dr. Swain, plaintiff had moderate restrictions of activities of daily living, moderate difficulty in maintaining social functioning, and moderate difficulty in maintaining concentration, persistence, or pace.  *PAGEID* 586.  Plaintiff was also moderately limited in nine out of twenty areas of functioning related to understanding and memory, sustained concentration and persistence, social interaction, and adaptation.  *PAGEID* 590-91.  Dr. Swain

concluded that plaintiff "retains the ability to sustain simple, repetitive tasks in a setting where duties are relatively static and changes can be easily explained. [Plaintiff] would need regular breaks and no strict production demands." *PAGEID* 593. Plaintiff would also "benefit from oral/demonstrated instructions. [Plaintiff] can interact with others appropriately for brief, superficial contacts." *Id*.

John Waddell, Ph.D., again reviewed the record and, on November 16, 2010, affirmed Dr. Swain's assessment. *PAGEID* 603.

### III. Administrative Decision

The administrative law judge found that plaintiff's severe impairments consist of depressive disorder, a learning disorder, and borderline intellectual functioning. *PAGEID* 68. The administrative law judge also found that plaintiff's impairments neither meet nor equal a listed impairment, including Listing 12.05C:

> The "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. Although at the consultative examination in 2005 [*i.e.*, Dr. Tanley's consultative evaluation] the claimant tested with verbal and full scale IQs in the 60s, it was determined that, in light of his performance IQ of 78 that the claimant's other two scores were depressed due to a learning disorder, and thus a diagnosis of borderline intellectual functioning has been offered instead of a diagnosis of mild mental retardation. Additionally, the claimant's ability to perform some work activity as well as his ability to perform routine activities and respond appropriately to questions do not support a diagnosis of mild mental retardation but rather borderline intellectual functioning. For these reasons the requirements of Listing 12.05C are not met or equaled.

*PAGEID* 70-72.

The administrative law judge went on to find that plaintiff has the residual functional capacity ("RFC") to

> perform a full range of work at all exertional levels but with the following nonexertional limitations: no greater than simple tasks and instructions with the ability to maintain concentration and attention for two hour segments over an eight hour workday; the ability to respond appropriately to supervisors and co-workers in a task oriented setting where contact with others is casual and infrequent; and the ability to adapt to simple changes and avoid hazards. Additionally, the claimant is considered illiterate.

*PAGEID* 70-72. The administrative law judge relied on the testimony of the vocational expert to find that this RFC allows plaintiff to perform his past relevant work as a farm laborer. *PAGEID* 75. Accordingly, the administrative law judge concluded that plaintiff was not disabled within the meaning of the Social Security Act from June 1, 2007, through the date of the administrative law judge's decision. *Id*.

**IV. Discussion**

Pursuant to 42 U.S.C. § 405(g), judicial review of the Commissioner's decision is limited to determining whether the findings of the administrative law judge are supported by substantial evidence and employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389 (1971); *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

11

*See Buxton v. Haler*, 246 F.3d 762, 772 (6th Cir. 2001); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). This Court does not try the case *de novo*, nor does it resolve conflicts in the evidence or questions of credibility. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, this Court must examine the administrative record as a whole. *Kirk*, 667 F.2d at 536. If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if this Court would decide the matter differently, *see Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *Longworth,* 402 F.3d at 595.

Plaintiff argues, *inter alia*, that the administrative law judge erred in concluding that plaintiff does not meet the requirements of Listing 12.05C. *Statement of Errors*, pp. 15-18. Specifically, plaintiff argues that the administrative law judge erred in finding that plaintiff did not have a valid IQ score of between 60 and 70 and in concluding that plaintiff did not manifest deficits in adaptive functioning prior to age 22.

Listing 12.05 requires, under appropriate circumstances, a finding of disability based on the claimant's intellectual disability:[2]

---

[2] Prior to September 3, 2013, Listing 12.05 referred to "mental retardation," rather than to "intellectual disability." The administrative law judge and the parties refer to "mental retardation."

12

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when . . . (C) [the claimant has demonstrated] a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C. A claimant must establish three elements in order to satisfy Listing 12.05C: that he experiences "significantly subaverage general intellectual functioning with deficits in adaptive functioning [that] initially manifested during the developmental period" (i.e., the diagnostic description); (2) that he has a "valid verbal, performance, or full scale IQ of 60 through 70," and (3) that he suffers from "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id*. *See also Foster v. Harris*, 279 F.3d 348, 354–55 (6th Cir. 2001). Under the Social Security regulations, "loss of adaptive functioning" is "manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R., Pt. 404, Subpt. P., App. 1 § 12.00(C)(4). *See also West v. Comm'r Soc. Sec. Admin.*, 240 F. App'x 692, 698 (6th Cir. 2007) ("Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills."). Present IQ scores do not alone establish that the claimant suffered

13

subaverage intellectual functioning or deficits in adaptive functioning during the developmental period.  "A claimant must produce evidence beyond his present IQ scores to show that he exhibited deficits during his developmental period."  *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491–92 (6th Cir. 2010) (citing *Foster*, 279 F.3d at 354–55).

As discussed *supra*, in order to satisfy Listing 12.05C, the record must include a valid verbal, performance, or full scale IQ score of 60 through 70.  Plaintiff points to school records that refer to a November 1993 WISC-III IQ score of 67, a January 1997 verbal IQ score of 68, and a full scale IQ score of 68.  *See PAGEID* 304-05.  Plaintiff's school records also refer to a WISC-R IQ score of 71 in September 1991.  *Id*.  In May 2005, plaintiff achieved a verbal IQ score of 66, a performance IQ score of 78, and a full scale IQ score of 69 on the WAIS-III administered by Dr. Tanley.  *PAGEID* 481.

The administrative law judge expressly considered plaintiff's 2005 verbal and full scale IQ scores in evaluating Listing 12.05C, but concluded that those scores were invalid.  *PAGEID* 71.  Specifically, the administrative law judge found that, in light of plaintiff's performance IQ score of 78, plaintiff's lower verbal and full scale IQ scores were "depressed due to a learning disorder, and thus a diagnosis of borderline intellectual functioning has been offered instead of a diagnosis of mild mental retardation."  *Id*.  This conclusion is supported by substantial evidence in the record.  *See PAGEID* 481 (indicating that plaintiff's 2005 IQ scores are "suggestive

14

of a Learning Disorder for verbally mediated material" and diagnosing "said Learning Disorder and Borderline intelligence").  Nevertheless, the administrative law judge did not expressly evaluate the 1993 and 1997 scores that fell within the applicable range of 12.05C, and he did not expressly explain why those otherwise qualifying scores may also be invalid.

The Commissioner argues that the administrative law judge did not err in this regard and that plaintiff is "unable to satisfy his burden [under 12.05C] because he was not diagnosed with mental retardation and did not have significant adaptive deficits." *Commissioner's Response*, p. 10.  According to the Commissioner, "[b]ecause Plaintiff cannot point to any diagnosis of mental retardation, it was proper for the ALJ to find he did not meet Listing 12.05C."  *Id*. at p. 11.  The Commissioner further argues that plaintiff's 1991, 1993, and 1997 IQ scores "are of very limited benefit in evaluating Plaintiff's claim of disability beginning 2007." *Id*.  Specifically, the Commissioner argues that plaintiff's 1991 and 1993 scores were not accompanied by any narrative report and that his 1997 scores are from tests "conducted when [plaintiff] was 15 years old; ten years prior to his alleged onset date, and 14 years from the ALJ's decision.  Secondly, these scores carry no diagnosis of mental retardation or borderline intellectual functioning."  *Id*. at pp. 11-12.  Finally, the Commissioner points to plaintiff's work history, "ability to do wide a variety of daily activities," and consultative exams from 2005 and 2008, and argues that "the record demonstrates

15

that Plaintiff did not have adaptive deficits that met or medically equaled Listing 12.05." *Id*. at pp. 13-15.  The Commissioner's arguments are not well taken.

First, the Commissioner's implication that a formal diagnosis of mental retardation is necessary under Listing 12.05C, *see Commissioner's Response*, pp. 10 ("Plaintiff is unable to satisfy his burden in this matter because he was not diagnosed with mental retardation and did not have significant adaptive deficits."), 11 ("Because Plaintiff cannot point to any diagnosis of mental retardation, it was proper for the ALJ to find he did not meet Listing 12.05."), 11 ("[Plaintiff's 1997 scores] carry no diagnosis of mental retardation or borderline intellectual functioning."), is without merit.  Although the absence of a formal diagnosis of mental retardation may be relevant to a claim under Listing 12.05C, *see Cooper v. Comm'r Soc. Sec.*, 217 F. App'x 450, 452 (6th Cir. 2007) ("It is undisputed that no psychologist has diagnosed [the plaintiff] with mental retardation.  The examiner and clinical psychologist who tested him diagnosed him instead as borderline intellectual functioning."), the formal diagnosis is not a necessary prerequisite to the Listing. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C.  Second, although plaintiff has been diagnosed with borderline intellectual functioning ("BIF"), there is no indication that any of the BIF diagnoses were rendered after consideration of plaintiff's 1993 and 1997 IQ scores. *Cf. O'Conner v. Comm'r Soc. Sec.*, No. 4:13-cv-00072, 2013 WL 6817900, at *10 (N.D. Ohio Dec. 23, 2013) (finding substantial evidence in the

16

record to support an administrative law judge's invalidation of IQ scores because, *inter alia*, a state agency consultative psychologist diagnosed borderline intellectual functioning after reviewing the plaintiff's IQ scores). Notably, neither Dr. Tanley nor the state agency psychologists who reviewed the record made any mention of the 1993 and 1997 IQ scores. *See PAGEID* 479-82 (Dr. Tanley), 490 (Dr. Williams), 532 (Dr. Waddell), 592 (Dr. Swain).

The Court also rejects the Commissioner's argument that plaintiff's 1993 and 1997 IQ scores were invalid. Notably, there is no indication that the administrative law judge considered those scores in evaluating plaintiff's claim by reference to Listing 12.05C; indeed, the administrative decision makes no mention whatsoever of these scores. This Court therefore cannot conclude that substantial evidence supports the invalidation of plaintiff's qualifying 1993 and 1997 IQ scores (assuming that the administrative law judge did, in fact, find the scores to be invalid). Furthermore, the Commissioner's attempt to discount plaintiff's 1997 scores on the basis of the "tests [being] conducted when [plaintiff] was 15 years old; ten years prior to his alleged onset date, and 14 years from the ALJ's decision," *Commissioner's Response*, p. 11, is entirely unpersuasive. In order to satisfy Listing 12.05C, a claimant must establish that the disabling condition existed "during the developmental period, i.e., the evidence [must] demonstrate[] or support[] onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C. *See also Foster*, 279 F.3d at 354-55. The fact that plaintiff was 15 years of age and

17

in "the developmental period" when the 1997 test was administered renders the results of that test particularly relevant in a 12.05C determination.  *Cf. Foster*, 279 F.3d at 354-55 ("[The plaintiff] has failed to show that her general intellectual functioning was 'significantly subaverage' prior to [age 22].  None of her testing or evaluation was contemporaneous with her developmental period; she was already 42 years of age when the first testing was performed in 1997.").  The administrative law judge's failure to consider plaintiff's 1993 and 1997 IQ scores in evaluating Listing 12.05C was therefore error.

The administrative law judge also failed to adequately consider plaintiff's deficits in adaptive functioning.  Despite noting in an earlier portion of his decision that plaintiff "was still having difficulty with language arts, math, and adaptive behavior" in high school, *see PAGEID* 68, there is no indication that the administrative law judge considered plaintiff's 1997 MFE in his evaluation of plaintiff's claim.  The MFE indicates, *inter alia*, that, when plaintiff was 15 years of age and in the ninth grade, he was able to read at a first grade level and perform arithmetic at a second grade level, *PAGEID* 302; his "general adaptive functioning [was] at the lower extreme for chronological age," *PAGEID* 308; and his performance in self-care skills, communication skills, social skills, academic skills, occupational skills, and his overall adaptive behavior inventory composite quotient each fell at or below the first percentile of achievement.  *Id*.  Furthermore, plaintiff's special

18

education teacher reported that plaintiff "needs to improve employability skills in the areas of punctuality and attending on time, general work habits, work quantity and quality, relations with supervisors, setting personal goals and showing initiative." *PAGEID* 309. This evidence is directly relevant to the issue of plaintiff's adaptive functioning prior to age 22. *See West*, 240 F. App'x at 698 ("Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills."); 20 C.F.R., Pt. 404, Subpt. P., App. 1 § 12.00(C)(4) ("[Loss of adaptive functioning" is "manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."). The administrative law judge's failure to consider plaintiff's MFE was therefore likewise improper.

In short, the Court concludes that the administrative law judge erred in his evaluation Of plaintiff's claim by reference to Listing 12.05C.

It is therefore **RECOMMENDED** that the decision of the Commissioner be **REVERSED** pursuant to Sentence 4 of 42 U.S.C. § 405(g) and that this action be **REMANDED** to the Commissioner of Social Security for further consideration of Listing 12.05C.

Having concluded that the action must be remanded on this basis, the Court need not and does not address plaintiff's remaining arguments.

If any party seeks review by the District Judge of this *Report and Recommendation*, that party may, within fourteen (14) days, file and serve on all parties objections to the *Report and Recommendation*, specifically designating this *Report and Recommendation*, and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to *de novo* review by the District Judge and of the right to appeal the decision of the District Court adopting the *Report and Recommendation*. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Smith v. Detroit Fed'n of Teachers, Local 231 etc.*, 829 F.2d 1370 (6th Cir. 1987); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


January 16, 2014                                             *s/Norah McCann King*
                                                              Norah M<sup>c</sup>Cann King
                                                         United States Magistrate Judge